NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180046-U

NO. 4-18-0046

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JAWAUN J. GIPSON, | ) | No. 16CF1710 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant is not entitled to a new trial, and the circuit court did not abuse its
              discretion in sentencing defendant to 12 years' imprisonment.

¶ 2          In December 2016, the State charged defendant, Jawaun J. Gipson, by

information with one count of armed robbery (720 ILCS 5/18-2(a)(3) (West 2016)), one count of

resisting a peace officer (720 ILCS 5/31-1(a) (West 2016)), one count of aggravated discharge of

a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)), and one count of aggravated battery with a

firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)).  At the beginning of defendant's November

2017 jury trial, the State dismissed the charge of resisting a peace officer.  At the conclusion of

the trial, a jury found defendant guilty of aggravated discharge of a firearm and aggravated

battery with a firearm.  Defendant filed a motion for a new trial.  At a joint December 2017

hearing, the Champaign County circuit court denied defendant's posttrial motion and sentenced

him to 12 years' imprisonment for aggravated battery with a firearm. The aggravated discharge of a firearm conviction was vacated under the one-act, one-crime rule. Defendant filed a motion to reconsider his sentence, which the court denied in January 2018.

¶ 3        Defendant appeals, contending (1) he was denied a fair trial because the prosecutor vouched for and unfairly bolstered the complainant's testimony, (2) he was denied effective assistance of counsel because counsel failed to object to the State's repeated use of defendant's prejudicial Facebook name, (3) the circuit court erred by refusing to give defendant's proposed second modified jury instruction, and (4) the court abused its discretion by sentencing defendant to 12 years' imprisonment. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        The State's three charges on which defendant was tried related to defendant's alleged actions on December 15, 2016, in the parking lot of the Wal-Mart in Rantoul, Illinois. The victim listed in all three charges was Antoine Rogers. On the first day of defendant's November 2017 trial, the circuit court granted the State's motion for Rogers to receive use immunity under section 106-2.5(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/106-2.5(b) (West 2016)). After being granted use immunity, Rogers gave sworn testimony he had told the prosecutor for the first time that morning, he was meeting the woman known to him as Janae at Wal-Mart to sell her cocaine. He had previously told the police he was meeting her to give her money. The court also ruled on numerous motions *in limine*, and none of those rulings are challenged on appeal.

¶ 6        After opening statements in which the State and defense counsel mentioned the grant of use immunity to Rogers, the State presented the testimony of (1) Calvin Bolser, a Wal-Mart employee; (2) Rogers, the victim; (3) Douglas France, a Wal-Mart employee; (4) Timothy

Rivest, a police detective; (5) Bert Richter, a police officer; (6) Jeremy Heath, a police officer; (7) Greg Willard, a police officer; (8) Justin Bouse, a police detective; (9) Ellen Chapman, a forensic scientist; and (10) Stephen Vogel, a police officer. The State also presented numerous exhibits, including a Wal-Mart surveillance video, photographs of the victim, and documents related to defendant's Facebook page. Defendant presented the testimony of James Schmidt, a police officer, photographs of the van, and short videos from police body cameras. The evidence relevant to the issues on appeal follows.

¶ 7        At the outset of Rogers's testimony on direct examination, the following dialogue took place:

"Q. You and I have talked a couple of times about your testimony here today, correct?

A. Correct.

Q. Okay. And in fact yesterday we talked about—we talked about what could happen to you if you do testify today, correct?

A. Right.

Q. Yesterday I told you I was more interested in you getting shot in the face than I was in the drug deal, correct?

MR. ALLEGRETTI [DEFENSE COUNSEL]: Objection, Judge, to—this is hearsay.

THE COURT: Overruled.

Q. Yesterday I told you I was more interested in you getting shot in the face than I was in the drug deal; is that correct?

A. Correct.

- 3 -

Q. And yesterday I told you you would have something called use immunity for your testimony; is that correct?

A. Correct.

Q. Now you understand that under the terms of that deal the State cannot use your testimony here against you to prosecute you?

A. Right.

Q. Do you understand that the State can still prosecute you for perjury?

A. Yes.

Q. Do you understand that the only way you can get in trouble for your testimony here today is if you do not tell the truth?

[DEFENSE COUNSEL]: Objection, Judge.

A. Yes.

THE COURT: Grounds?

[DEFENSE COUNSEL]: May we approach?

[Off the record discussion at the side bar.]

THE COURT: The last objection is sustained."

Later in the trial, it was stated on the record defense counsel's aforementioned objection was based on Illinois Rule of Evidence 608(2) (eff. Jan. 6, 2015). The prosecutor also revisited the issue of immunity at the beginning of redirect by asking similar questions to the ones on direct examination. The only objections defense counsel raised to the immunity questions on redirect were asked and answered and Illinois Rule of Evidence 608(2) (eff. Jan. 6, 2015). Defense counsel also questioned Rogers about his use immunity.

¶ 8 Rogers further testified he went to the Wal-Mart in Rantoul on December 15 to

meet a woman he had met through his cousin. Rogers knew the woman as "Janae." Rogers's friend, "DB," had driven him to Wal-Mart. Rogers admitted he had initially told police his friend, Eric Perkins, was the one who drove him to Wal-Mart. Rogers testified "Janae" wanted to buy some cocaine from him, and the plan was to meet her at a car by the front doors of Wal-Mart. Rogers admitted he initially told the police he was meeting "Janae" to give her $40 for gas and groceries. Rogers expected "Janae" to be alone for the meeting. Rogers was unexpectedly directed to a van, and a male in the front passenger seat told him to get in the van. Rogers had never seen the man before. The woman Rogers knew as "Janae" was in the driver's seat of the van. According to Rogers, the area was well-lit from the lights from Wal-Mart, and he could see clearly in the van. Rogers identified defendant in-court as the person who was in the passenger's seat of the van and identified the driver of the van as the woman in the photograph, which was labeled State's exhibit No. 10. Rogers testified "Janae" and defendant sampled the cocaine. Defendant then reached for a gun, pointed it at Rogers, and told Rogers to empty his pockets. Rogers placed between $350 and $400 on the floor of the van. Defendant told Rogers to get out of the van, and Rogers did so.

¶ 9     After exiting the van, Rogers initially waited for his friend to come help him but then ran back up to the driver's side of the van. The driver's window was up. Rogers said something to defendant but did not recall exactly what he said. Rogers testified he was angry because he had been robbed. Rogers saw a flash right in front of his face. The van's window shattered right in front of Rogers's face. After the gunshot, Rogers heard defendant say "go," and the van took off. Rogers received facial injuries due to the broken glass.

¶ 10     Rogers immediately had his friend drive him to his apartment on Harmon Drive, so Rogers could look at his injuries. Rogers had glass in his eyes and face, which was painful.

He called for an ambulance and told his friend to go. After being treated at the hospital, Rogers went to a friend's apartment on Keystone Drive and searched on Facebook for the people in the van. Rogers found the Facebook post, which was the State's exhibit No. 10. The photograph contained the van in which he got into and the woman who was in the driver's seat. However, the account was not in the name of Janae Taylor. The name of the account was Brianna and Adrianna Holloway. Rogers determined "Janae" was actually Adrianna Holloway. Rogers thought he saw the male passenger in photographs in Holloway's account. Rogers found two Facebook accounts for whom he thought might be the male passenger. The name for one account was Shoof Dorsey, and the name for the other account was HeadHuncho Shoota. Rogers thought they may have been the same person. Rogers contacted the police and later spoke to Officer Schmidt about what he learned from Facebook.

¶ 11 Detective Bouse testified he went to an address on East Hill Street about 16 hours after the shooting. He saw a van in the driveway, which appeared to be the same van as the one in Holloway's Facebook photograph. The van was registered to Holloway, and the address on the registration was the East Hill address. Detective Bouse observed a couple of pieces of broken glass outside of the driver's side window. He also noticed broken glass in the windowsill of the van. The van's driver's side door was missing a window. The van also had an indentation on the driver's side door. Detective Bouse had the van towed to the impound lot.

¶ 12 Officer Vogel testified he was driving on Bradley Avenue on December 23, 2016, when he observed defendant walking. Officer Vogel attempted to approach defendant in a marked squad car, and defendant took off running when he saw the officer. Officer Vogel pursued defendant in his squad car and was able to apprehend him.

¶ 13 Officer Willard interviewed defendant after he was apprehended. Defendant

stated he was in Chicago on the night of December 15, 2016, but did not give any precise dates for his trip to Chicago or provide a way to confirm his trip. Defendant did admit he was in a dating relationship with Holloway. He confirmed Holloway's address, which was where Detective Bouse located the van, and her telephone number, which was the same one Rogers said "Janae" called him from. Defendant also confirmed Holloway owned a van and was the sole user of the van. Further, despite Officer Willard never naming the victim, defendant told the officer he had been contacted by the victim. Defendant confirmed he had received a threatening message from the victim. Additionally, Officer Willard testified it was common for people who are purchasing or arranging to purchase narcotics to use a false name.

¶ 14    Moreover, Officer Willard testified defendant also confirmed his Facebook account was under the name HeadHuncho Shoota. Officer Willard obtained a warrant for defendant's Facebook account and Rogers's account. The threatening message Rogers sent defendant stated the following: "u shuda killed me u bitch ass nigga u shot me n the face u broke ass bitch ik who you are ik yo bitch and were yo kids sleep." The Facebook records also showed defendant messaged on the day after the shooting a friend stating, "We Need A Door." Later in the day, defendant messaged another friend stating, "I Needa Door For That Van Cuzo Asap." The friend replied, "Wya," and defendant replied by providing Holloway's telephone number.

¶ 15    Chapman testified she performed the gunshot residue testing. Potential gunshot residue is collected on a sampler, which is a metal disk covered with adhesive. Only the sampler from the upper molding of the front passenger door was positive for gunshot residue. Chapman testified that, if the gun was fired from the passenger's seat and through the driver's window, then gunshot residue should have been on the driver's door as well. As to the absence of gunshot residue on the driver's side door, Chapman explained that, if the gun was close to the window,

the gun powder would have all blown out the window.

¶ 16 During closing arguments, defense counsel challenged Rogers's credibility. In rebuttal, the prosecutor began by stating the following:

> "Apparently we're just arguing about one thing, whether the defendant was the person who did it. I'd like you to imagine a very different trial from the one you've seen over the course of the last couple of days, one in which Antoine Rogers is prosecuted for cocaine. He's prosecuted because he went to a Wal-Mart and he entered a van, and then he left, and then he told people when he was loaning some money—somebody money. And a bag was recovered with no connection to the crime, and no cocaine was recovered, and that's it. That's the offense Mr. Rogers, according to defense counsel, was trying [*sic*] avoid prosecution for. There is no way the State could prosecute Antoine Rogers for cocaine that was never recovered, that was never tied to him by anything but suspicion until he decided to tell the truth. And yes, he was granted immunity. He was granted immunity, subject to a condition that he tell the truth, and the only way he gets in trouble right now is for perjury. So if he's trying to protect himself, the only thing he can do to do that is to tell the truth. There was no free deal for cocaine prosecution. There was a deal—
>
> [DEFENSE COUNSEL]: Objection, Judge it's not parts [*sic*] of the evidence.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: There was no free deal regarding a cocaine prosecution, there was a deal that his testimony would not be used against him.

And so if he said absolutely nothing, he's no worse off than he was before. And yet, what does he do? Throughout this entire period, what does he do? He reaches out, over, and over, and over again, in different ways, trying to get information to the police to tie—to lead them to people he thinks are responsible. If he's trying to avoid prosecution himself, why is he doing that? Why is he not just keeping his mouth shut?"

¶ 17　　　During the jury instruction conference, defendant proposed two modified jury instructions for Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.15) regarding witness identification. The circuit court denied both instructions. At the conclusion of the trial, the jury found defendant guilty of aggravated battery with a firearm and aggravated discharge of a firearm but found him not guilty of armed robbery.

¶ 18　　　On November 30, 2017, defendant filed a motion for a new trial. In his motion, defendant again claimed Rogers's testimony violated Illinois Rule of Evidence 608 (eff. Jan. 6, 2015). He also asserted the circuit court erred by refusing to give his modified jury instructions regarding witness identification.

¶ 19　　　At a joint December 11, 2017, hearing, the circuit court denied defendant's posttrial motion and addressed sentencing. In addition to the presentence investigation report, the State presented the testimony of Sergeant Josh Sapp. Sergeant Sapp testified about an October 24, 2017, incident in the jail. Defendant had been involved in a fight in the jail with several other inmates. According to Sergeant Sapp, defendant and three other inmates surrounded a fifth inmate. One of the other inmates with defendant started fighting with the fifth inmate, and defendant joined the fight. Sergeant Sapp observed defendant punch the fifth inmate more than once. After the fifth inmate fell to the floor, defendant continued to strike the fifth

inmate. Defendant presented numerous letters in his support and gave a statement of allocution expressing remorse for his actions. After hearing all the evidence, the court sentenced defendant to 12 years' imprisonment for aggravated battery with a firearm.

¶ 20   On December 20, 2017, defendant filed a motion to reconsider his sentence, asserting the circuit court placed excessive weight on the factors in aggravation and gave insufficient weight to the factors in mitigation. After a January 16, 2018, hearing, the circuit court denied defendant's motion.

¶ 21   On January 22, 2018, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. July 1, 2017). Accordingly, this court has jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 22   II. ANALYSIS

¶ 23   A. Fair Trial

¶ 24   Defendant first asserts he was denied a fair trial because the prosecutor vouched for the credibility of Rogers, the State's chief witness, through the prosecutor's own unsworn testimony. The State contends defendant has forfeited this issue. On the merits, the State contends the prosecutor did not improperly vouch for Rogers's testimony and the prosecutor's questioning of Rogers did not result in unsworn testimony.

¶ 25   We agree with the State defendant forfeited his argument for review. In a criminal case, both a trial objection and a written posttrial motion raising the issue are necessary to preserve an error for review. *People v. McClendon*, 197 Ill. App. 3d 472, 482, 554 N.E.2d 791, 797 (1990). Moreover, "[a] defendant may not change or add to the basis for his objection on review." *McClendon*, 197 Ill. App. 3d at 482, 554 N.E.2d at 797. A defendant's specific objection to evidence eliminates all grounds not specified. *McClendon*, 197 Ill. App. 3d at 482,

554 N.E.2d at 797. At trial, defendant only raised the objections of hearsay; asked and answered; and a violation of Illinois Rule of Evidence 608(2) (eff. Jan. 6, 2015), which was the objection raised in the sidebars as explained later in the trial transcript. We disagree with defendant's contention the aforementioned objections are analogous to his argument on appeal. Thus, we find defendant has forfeited this issue.

¶ 26       In the alternative, defendant asserts we should review the issue under the plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

Under both prongs, the defendant bears the burden of persuasion. *Sargent*, 239 Ill. 2d at 190, 940 N.E.2d at 1059. Defendant contends both prongs apply in this case.

¶ 27       Assuming the prosecutor's actions were erroneous, the error does not rise to the level of plain error. As to the first prong, defendant asserts the evidence was closely balanced because the State's case rested solely on Rogers's unreliable identification of defendant. The record does not support defendant's assertion. The trial evidence included circumstantial evidence linking defendant to the crime. Rogers had known the female driver of the van for a couple of months and identified her actual name of Holloway through Facebook. Defendant

- 11 -

acknowledged Holloway was his girlfriend. A van matching the description of the one used in facilitating the crime was found in Holloway's driveway the day after the shooting. The van was missing a driver's side window and had broken glass in the windowsill. Gunshot residue was found on the van's passenger side door. Moreover, Facebook messages showed defendant asked for help with a door the day after the shooting. Additionally, defendant fled from police and could not provide any information supporting his assertion he was in Chicago the night of the shooting.

¶ 28 Regarding the second prong, defendant contends the error undermined the integrity of the judicial process because it created the untenable risk the jury found defendant guilty based on the prosecutor's unsworn and unchallenged testimony supporting Rogers's credibility. First, as we explained with the first prong, the State's evidence linking defendant to the crime was more than Rogers's testimony. Thus, Rogers's testimony was not the sole basis for defendant's conviction and not as critical to his conviction as defendant characterizes it. Second, this case is distinguishable from the case cited by defendant, *People v. Davis*, 287 Ill. App. 3d 46, 57, 677 N.E.2d 1340, 1348 (1997), where the reviewing court found the prosecutor improperly inserted his personal opinion and invoked the integrity of the State's Attorney's office when he made the comment defense witnesses were the worst liars he had ever seen testify for a defendant. Here, the prosecutor did not make explicit comments about a witness's credibility. With his questions, the prosecutor was trying to explain the use immunity Rogers had received the day before and emphasize Rogers could still be prosecuted for perjury. Use immunity is a legal concept and not common knowledge to the average person. Nonleading questions would likely have been ineffective in setting forth Rogers's use immunity. Further, the prosecutor went over the immunity again in redirect after defense counsel raised the issue during

cross-examination.  We recognize a stipulation regarding Rogers's use immunity or the circuit court explaining Rogers's use immunity would have been the better approach.  However, we do not find the prosecutor was trying to invoke the integrity of the state's attorney's office or express his own opinion about Rogers's credibility by asking leading questions about use immunity or by the comments in closing argument that were invited by defense counsel's challenge to defendant's believability.

¶ 29                              B. Ineffective Assistance of Counsel

¶ 30        Defendant further argues he was denied effective assistance of counsel because trial counsel did not move to exclude defendant's prejudicial Facebook name, HeadHuncho Shoota.  The State contends defendant's nickname was relevant to identifying him, and thus defendant was not denied effective assistance of counsel.

¶ 31        This court analyzes ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999).  To obtain reversal under *Strickland*, a defendant must prove (1) his counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant.  *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163.  To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI).  *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163.  Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy.  *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163.  To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors,

- 13 -

the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. The *Strickland* Court noted a court should address prejudice rather than whether counsel's representation was constitutionally deficient when to do so is easier. *Strickland*, 466 U.S. at 697. Moreover, to establish prejudice under *Strickland* based on counsel's failure to file a pretrial motion, the defendant must demonstrate the unargued pretrial motion is meritorious, and a reasonable probability exists the trial's outcome would have been different had the motion been granted. See *People v. Henderson*, 2013 IL 114040, ¶ 15, 989 N.E.2d 192 (addressing a motion to suppress).

¶ 32        This court has stated the following about referring to the defendant by his nickname:

> "Generally, there is no impropriety in referring to a defendant by his or her nickname. [Citation.] It is not reversible error to call a defendant by his nickname. [Citation.] However, ordinary considerations of fair play dictate that the use of a nickname that has a pejorative connotation be permitted sparingly, only upon a showing of necessity for its use. [Citation.] [E]ven when [pejorative connotations exist], it is not improper to allow a defendant to be referred to by his nickname if witnesses knew and identified defendant by that name. [Citation.]" (Internal quotation marks omitted.) *People v. Campbell*, 309 Ill. App. 3d 423, 428, 721 N.E.2d 1225, 1228 (1999), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

In *Campbell*, 309 Ill. App. 3d at 429, 721 N.E.2d at 1228, we found the use of the nickname "Psycho" during the defendant's trial did not rise to the level of prejudicial error even though it had pejorative connotations. We first noted the defendant's nickname was introduced only for

the relevant purpose of establishing the defendant's identity and two witnesses identified the defendant to police by the nickname. *Campbell*, 309 Ill. App. 3d at 429, 721 N.E.2d at 1228. Second, we found the witnesses knew and identified defendant by that name, regardless of whether they knew the defendant by another name. *Campbell*, 309 Ill. App. 3d at 429, 721 N.E.2d at 1228. We further found our review of the record indicated the defendant's nickname was used sparingly at trial. *Campbell*, 309 Ill. App. 3d at 429, 721 N.E.2d at 1228. Last, we highlighted the fact the State neither emphasized the nickname when it elicited testimony from witnesses nor used the nickname in its closing argument. *Campbell*, 309 Ill. App. 3d at 429, 721 N.E.2d at 1228.

¶ 33       While we agree with defendant the name of his Facebook account has pejorative connotations, defendant gave his account that name. The references at trial to "HeadHuncho Shoota" were to the Facebook account and not defendant directly. Thus, the situation is less prejudicial than nicknames, which are usually established by others and are clearly direct references to the defendant. Moreover, the victim identified defendant as the possible shooter by his Facebook account, and not by personal knowledge or a lineup. In fact, at trial, defendant challenged the victim's identification of him based on the fact the victim identified two Facebook accounts after extensively searching Facebook. The police investigated the owners of both Facebook accounts. According to Officer Willard, defendant admitted to owning the Facebook account "HeadHuncho Shoota" during his interview of defendant. Defendant gave other statements, which resulted in him becoming the police's primary suspect for the shooting. At trial, defendant did not stipulate he was the owner of the Facebook account "HeadHuncho Shoota," and thus the State had to prove it. In doing so, the record does not show the State emphasized the name of the Facebook account. The State was merely establishing how

defendant was identified as the shooter in this case. The State only used the name of the

Facebook account once in closing arguments when referring to defendant's account. Given

defendant's identity was discovered through his Facebook account and that identification was

challenged by the defendant at trial, a pretrial motion *in limine* seeking to prevent the use of the

name of the Facebook account would not have been meritorious. Thus, defendant has failed to

establish the prejudice prong of the *Strickland* test. Accordingly, we do not find defendant was

denied effective assistance of counsel.

¶ 34                                    C. Jury Instruction

¶ 35          Defendant also asserts the circuit court erred by declining to give a modified jury

instruction on witness identification. At trial, defendant tendered two modified jury instructions

on witness identification. However, on appeal, he only argues the circuit court erred by refusing

to give his second modified jury instruction, which he claims was based on *People v. Ortiz*, 2017

IL App (1st) 142559, 73 N.E.3d 626. The State contends the circuit court properly gave IPI

Criminal 4th No. 3.15.

¶ 36          " 'The sole function of instructions is to convey to the minds of the jury the

correct principles of law applicable to the evidence submitted to it in order that, having

determined the final state of facts from the evidence, the jury may, by the application of proper

legal principles, arrive at a correct conclusion according to the law and the evidence.' " *People

v. Nere*, 2018 IL 122566, ¶ 29, 115 N.E.3d 205 (quoting *People v. Ramey*, 151 Ill. 2d 498, 535,

603 N.E.2d 519, 534 (1992)). Generally, we review whether the circuit court erred in refusing a

particular jury instruction under an abuse of discretion standard. *Nere*, 2018 IL 122566, ¶ 29.

An abuse of discretion occurs only when the circuit court's decision was " 'arbitrary, fanciful, or

unreasonable to the degree that no reasonable person would agree with it.' " *People v. Lerma*,

2016 IL 118496, ¶ 23, 47 N.E.3d 985 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634). However, whether a particular jury instruction accurately conveyed to the jury the law applicable to the case is an issue we review *de novo*. *Nere*, 2018 IL 122566, ¶ 29.

¶ 37        Here, the circuit court gave the eyewitness instruction based on IPI Criminal 4th No. 3.15. Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) provides, in pertinent part, the following:

> "Whenever Illinois Pattern Jury Instructions, Criminal, contains an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI Criminal instruction shall be used, unless the court determines that it does not accurately state the law."

¶ 38        Defendant claims IPI Criminal 4th No. 3.15 is inaccurate because the factors it lists are from the 1972 decision in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). IPI Criminal 4th No. 3.15 states the following:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
>
> [1] The opportunity the witness had to view the offender at the time of the offense.
>
> [2] The witness's degree of attention at the time of the offense.
>
> [3] The witness's earlier description of the offender.
>
> [4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation."

¶ 39    Defendant claims the aforementioned *Biggers* factors are incorrect and under inclusive. The only Illinois case defendant cites in support of his allegation is *Ortiz*, 2017 IL App (1st) 142559, ¶ 48, where the circuit court gave a modified jury instruction on witness identification instead of IPI Criminal 4th No. 3.15 but refused to give a second modified witness jury instruction on witness identification. The modified instruction the circuit court gave added the following language to the second factor listed in IPI Criminal 4th No. 3.15: "including the following non-exhaustive list of factors: Stress. Weapon focus. Duration. Distance and lighting. *** Memory decay. ***." *Ortiz*, 2017 IL App (1st) 142559, ¶¶ 47-48.

¶ 40    On appeal, the defendant argued he was denied a fair trial because the circuit court refused to give his second modified jury instruction, which stated the following:

" 'Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification.' "

*Ortiz*, 2017 IL App (1st) 142559, ¶ 47.

Specifically, the defendant argued his modified instruction was a more accurate statement of the law on witness identification because a jury must critically analyze witness identification, witness identifications are not always accurate, and a witness's level of confidence was not an indication of an identification's reliability. *Ortiz*, 2017 IL App (1st) 142559, ¶ 49.

¶ 41    The reviewing court found the circuit court did not abuse its discretion by

refusing the second modified jury instruction. *Ortiz*, 2017 IL App (1st) 142559, ¶ 51. It noted the circuit court had granted over the State's objection the defendant's requested modified instruction, which included the witness's certainty factor that the defendant found problematic on appeal. *Ortiz*, 2017 IL App (1st) 142559, ¶ 51. The reviewing court also found the jury was properly instructed on witness identification through the instructions as a whole and agreed with the circuit court's characterization the defendant's second modified jury instruction read more like a defense argument than a jury instruction. *Ortiz*, 2017 IL App (1st) 142559, ¶ 51.

¶ 42 In this case, defendant asserts the circuit court should have given his second proposed modified jury instruction, which he claims was based on *Ortiz*. He recognizes the reviewing court in *Ortiz* did not explicitly rule on the propriety of the modified jury instruction given by the circuit court but notes the reviewing court also did not say the modified instruction was erroneous. Assuming *arguendo*, the *Oritz* court had approved the modified instruction used by the circuit court there, that decision still does not support defendant's argument. While defendant's second proposed modified instruction in this case contained the added language from *Ortiz*, it eliminated the fourth and fifth factors from IPI Criminal 4th No. 3.15, which the instruction given in *Ortiz* did not do. Thus, we find defendant's second modified jury instruction was not consistent with the one given in *Ortiz*.

¶ 43 The *Biggers* factors are still the law in Illinois. See *People v. Piatkowski*, 225 Ill. 2d 551, 567, 870 N.E.2d 403, 412 (2007); *People v. Macklin*, 2019 IL App (1st) 161165, ¶¶ 22-23, 125 N.E.3d 1246; *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 104, 58 N.E.3d 1242. We are not persuaded by the cases defendant cites from other states and the federal courts suggesting the *Biggers* factors are no longer reliable. Moreover, we question whether the authority defendant cites supports the radical change to IPI Criminal 4th No. 3.15 he proposed.

Accordingly, we find the language of IPI Criminal 4th No. 3.15 is currently an accurate statement of law and the circuit court did not abuse its discretion by declining to give defendant's second modified jury instruction for witness identification.

¶ 44　　Moreover, even if IPI Criminal 4th No. 3.15 is erroneous, we would find the error harmless beyond a reasonable doubt because circumstantial evidence linked defendant to the crime. As we explained earlier in addressing plain error, Rogers had known Holloway, the van's driver for two to three months. Defendant acknowledged Holloway was his girlfriend. The police found a van matching the description given by Rogers in Holloway's driveway the day after the shooting. That van was missing a driver's side window and had broken glass in the windowsill. Gunshot residue was found on the van's passenger side door. Moreover, Facebook messages showed defendant asking for help with a door the day after the shooting. Defendant also fled from police and could not provide any information supporting his assertion he was in Chicago the night of the shooting.

¶ 45　　　　　　　　　　　　D. Sentence

¶ 46　　Last, defendant argues the circuit court abused its discretion by sentencing him to 12 years' imprisonment. The State disagrees.

¶ 47　　This court has explained appellate review of a defendant's sentence as follows:

　　　　"A trial court's sentencing determination must be based on the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Generally, the trial court is in a better position than a court of review to determine an appropriate sentence based upon the

- 20 -

particular facts and circumstances of each individual case.
[Citation.]  Thus, the trial court is the proper forum for the
determination of a defendant's sentence, and the trial court's
decisions in regard to sentencing are entitled to great deference and
weight.  [Citation.]  Absent an abuse of discretion by the trial
court, a sentence may not be altered upon review.  [Citation.]  If
the sentence imposed is within the statutory range, it will not be
deemed excessive unless it is greatly at variance with the spirit and
purpose of the law or is manifestly disproportionate to the nature
of the offense."  (Internal quotation marks omitted.)  *People v.
Price*, 2011 IL App (4th) 100311, ¶ 36, 958 N.E.2d 341 (quoting
*People v. Hensley*, 354 Ill. App. 3d 224, 234-35, 819 N.E.2d 1274,
1284 (2004)); see also *People v. Alexander*, 239 Ill. 2d 205, 212-
13, 940 N.E.2d 1062, 1066 (2010).

¶ 48            Aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) is a

Class X felony (720 ILCS 5/12-3.05(h) (West 2016)), which carries a sentencing range of 6 to 30

years in prison (730 ILCS 5/5-4.5-25(a) (West 2016)).  Thus, defendant's 12-year prison term

falls in the lower half of the aforementioned sentencing range.  Defendant notes he must serve

85% of his sentence.  See 730 ILCS 5/3-6-3(a)(2) (West 2016) (text of section effective until Jan.

1, 2018).  Defendant points out his sentence is double the minimum and contends neither his

background nor the facts of the crime justify that sentence.

¶ 49            "The seriousness of the offense is the most important sentencing factor." *People

v. Watt*, 2013 IL App (2d) 120183, ¶ 50, 1 N.E.3d 1145.  In this case, the nature of the crime was

very serious. Defendant fired a firearm directly at and in close proximity to Rogers. Rogers was standing next to a vehicle, which was parked in front of Wal-Mart at 8 p.m. The driver of the vehicle was also in close proximity to defendant firing the weapon. As the State noted, the difference between this offense and first degree murder was "a matter of inches." While Rogers was not struck by the bullet, flying glass struck Rogers all over his face.

¶ 50    As to his background, defendant, who was 19 years old at the time of the offense, had a juvenile delinquency adjudication for criminal trespass to a residence and attempt (robbery) and was sentenced to probation. Defendant had his probation revoked for failing to report as directed and was again sentenced to probation. The outcome of that probation was unknown. As an adult, defendant committed driving without a valid license and driving on a sidewalk. While in jail awaiting trial, defendant was involved in an altercation with another inmate. Defendant and three other inmates surrounded the victim. Another inmate punched the victim first and then defendant and the other two inmates joined in. Defendant continued to punch the victim even after the victim had fallen to the ground. Thus, while defendant did not have a prior adult criminal conviction, his background was not clean.

¶ 51    Defendant did present evidence he was close with his family and had two young children. He also showed remorse for his actions and wanted to change the course of his life. In fact, the circuit court did find substantial mitigation. However, the court had to weigh the factors in mitigation along with the factors in aggravation. Given the serious nature of defendant's actions, we find the circuit court did not abuse its discretion in weighing the relevant factors and sentencing him to 12 years' imprisonment.

¶ 52                        III. CONCLUSION

¶ 53    For the reasons stated, we affirm the Champaign County circuit court's judgment.

¶ 54          Affirmed.